## EDWARDS *v.* KEARZEY.

The remedy subsisting in a State when and where a contract is made, and is to be performed, is a part of its obligation; and any subsequent law of the State, which so affects that remedy as substantially to impair and lessen the value of the contract, is forbidden by the Constitution of the United States, and, therefore, void.

ERROR to the Supreme Court of the State of North Carolina.

This action was commenced by Leonidas C. Edwards, March 31, 1869, in the Superior Court of Granville County, North Carolina, against Archibald Kearzey, to recover the possession of certain lands in that county. They were levied upon and sold by the sheriff, by virtue of executions sued out upon judgments rendered against Kearzey, on contracts which matured before April 24, 1868, when the Constitution of North Carolina took effect, the tenth article of which exempts from sale under execution or other final process, issued for the collection of any debt, the personal property of any resident of the State, and "every homestead, and the dwelling and buildings used therewith, not exceeding in value $1,000, to be selected by the owner thereof." Prior to that date, under statutes since repealed, certain specified articles of small value, and such other property as the freeholders appointed for that purpose might deem necessary for the comfort and support of the debtor's family, not exceeding in value $50 at cash valuation, and fifty acres of land in the county and two acres in the town of not greater value than $500, were exempt from execution. The lands in question were owned and occupied by Kearzey as a homestead, and as such were set off to him pursuant to the mode prescribed by the legislation for carrying the constitutional provision into effect. He had no other lands, and they did not exceed $1,000 in value.

Edwards was the purchaser at the sheriff's sale of said lands,· and received a deed therefor.

The court found for Kearzey, upon the ground that so much. of said art. 10 as exempts from sale, under execution or other final process obtained on any debt, land of the debtor of the value of $1,000, and the statutes enacted in pursuance thereof, embrace within their operation executions for debts which were contracted before the adoption of said Constitution; and that said article and said statutes, when so interpreted and enforced, are not repugnant to art. 1, sect. 10, of the Constitution of the United States, which ordains that no State shall pass any law impairing the obligation of contracts.

Judgment having been rendered upon the finding, it was, on appeal, affirmed by the Supreme Court of the State. Edwards then sued out this writ of error.

*Mr. Joseph B. Batchelor.* and *Mr. Edward Graham Haywood* for the plaintiff in error.

A law of a State, which is impeached upon the ground that it impairs the obligation of a contract, derives no additional authority as against the prohibition of the Federal Constitution, by reason of the fact that it is embodied in a State Constitution. *Railroad Company* v. *McClure,* 10 Wall. 511; *White* v. *Hart,* 13 id. 646; *Gunn* v. *Barry,* 15 id. 610; *Jefferson Branch Bank* v. *Skelly,* 1 Black, 436; *Dodge* v. *Woolsey,* 18 How. 331.

Such a law, exempting from sale under execution any substantial part of the debtor's property not so exempt at the time the debt was contracted, impairs the obligation of the contract, and is repugnant to the Constitution of the United States, and void. *Gunn* v. *Barry, supra; Nichols's Assignee* v. *Eaton et al.,* 91 U. S. 716; *Green.* v. *Biddle,* 8 Wheat. 1; *Bronson* v. *Kinzie,* 1 How. 311; *McCracken* v. *Hayward,* 2 id. 608; *Planters' Bank* v. *Sharp,* 6 id. 301; *Von Hoffman.* v. *Quincy,* 4 Wall. 535; *Lessley* v. *Phipps,* 49 Miss. 790; *The Homestead Cases,* 22 Gratt. (Va.) 266.

The decisions of this court have given a uniform construction to the constitutional provision which prohibits a State from passing any law impairing the obligation of contracts. From them the following propositions are adduced: —

1. The obligation of a contract is the duty of performance according to its terms, the remedy or means of enforcement being a part of the "obligation," which the States cannot by legislation impair. The municipal law enters into and forms a part of this obligation, and to that the contracting parties must be considered as referring, in order to enforce performance.

2. The State, if it modifies the remedy, must provide one as efficient and substantial as that subsisting when the contract was made.

3. The remedy is inseparable from the obligation, otherwise the contract would be of the nature of those imperfect obligations or moral duties, subject to the mere caprice and will of individuals.

4. Whilst the State is left free to prescribe the modes of suit and forms of process, it cannot clog the remedy with conditions and restrictions so as materially to impair its efficiency. *Fletcher* v. *Peck,* 6 Cranch, 87; *Green* v. *Biddle,* 8 Wheat. 1; *Sturges* v. *Crowninshield,* 4 id. 122; *Ogden* v. *Saunders,* 12 id. 213; *Bronson* v. *Kinzie,* 1 How. 311; *McCracken* v. *Hayward,* 2 id. 608; *Curran* v. *Arkansas,* 13 id. 304; *Freeman* v. *Howe,* 24 id. 450; *Von Hoffman* v. *Quincy,* 4 Wall. 535; *Hawthorne* v. *Calef,* 2 id. 10; *White* v. *Hart,* 13 id. 646; *Gunn* v. *Barry,* 15 id. 610; *Walker* v. *Whitehead,* 16 id. 314.

*Mr. A. W. Tourgee, contra.*

The decided cases do not affirm that the obligation of a contract includes the whole remedy, 2 Kent, Com. 397; 3 Story, Com., sect. 1392; *Sturges* v. *Crowninshield,* 4 Wheat. 122; *Mason* v. *Haile,* 12 id. 370; *Beers* v. *Haughton,* 9 Pet. 329; *Cook* v. *Moffat,* 5 How. 295; but, on the contrary, courts have declared that the remedy is no part of the obligation. *Moore* v. *Gould,* 11 N. Y. 281; *Jacobs* v. *Smallwood,* 63 N. C. 112; *Hill* v. *Kessler,* id. 437; *Garrett* v. *Cheshire,* 69 id. 396; *Wilson* v. *Sparks,* 72 id. 208; *Edwards* v. *Kearzey,* 75 id. 409. The precise question which this record presents may therefore be considered an open one. The homestead provision of the Constitution of North Carolina does not deny the creditor's right, but regulates the manner in which it shall be enforced.

It affects his remedy only incidentally, in the performance

of a high public behest. The safety and health of the Commonwealth are above private right. The sacredness of private property must yield to the imperious demands of public necessity. When two rights are in conflict, the greater must prevail. *Munn. v. Illinois,* 94 U. S. 113 ; *Chicago, Burlington, & Quincy Railroad Co. v. Iowa,* id. 155 ; *Peik v. Chicago & North-Western Railway Co.,* id. 164.

MR. JUSTICE SWAYNE delivered the opinion of the court.

The Constitution of North Carolina of 1868 took effect on the 24th of April in that year. Sects. 1 and 2 of art. 10 declare that personal property of any resident of the State, of the value of $500, to be selected by such resident, shall be exempt from sale under execution or other final process issued for the collection of any debt ; and that every homestead, and the buildings used therewith, not exceeding in value $1,000, to be selected by the owner, or, in lieu thereof, at the option of the owner, any lot in a city, town, or village, with the buildings used thereon, owned and occupied by any resident of the State, and not exceeding in value $1,000, shall be exempt in like manner from sale for the collection of any debt under final process.

On the 22d of August, 1868, the legislature passed an act which prescribed the mode of laying off the homestead, and setting off the personal property so exempted by the Constitution. On the 7th of April, 1869, another act was passed, which repealed the prior act, and prescribed a different mode of doing what the prior act provided for. This latter act has not been repealed or modified.

Three several judgments were recovered against the defendant in error : one on the 15th of December, 1868, upon a bond dated the 25th of September, 1865 ; another on the 10th of October, 1868, upon a bond dated Feb. 27, 1866 ; and the third on the 7th of January, 1868, for a debt due prior to that time. Two of these judgments were docketed, and became liens upon the premises in controversy on the 16th of December, 1868. The other one was docketed, and became such lien on the 18th of January, 1869. When the debts were contracted for which the judgments were rendered, the exemption laws in force were the acts of Jan. 1, 1854, and of Feb. 16, 1859. The first-named

act exempted certain enumerated articles of inconsiderable value, and "such other property as the freeholders appointed for that purpose might deem necessary for the comfort and support of the debtor's family, not exceeding in value $50, at cash valuation." By the act of 1859, the exemption was extended to fifty acres of land in the county, or two acres in a town, of not greater value than $500.

On the 22d of January, 1869, the premises in controversy were duly set off to the defendant in error, as a homestead. He had no other real estate, and the premises did not exceed $1,000 in value. On the 6th of March, 1869, the sheriff, under executions issued on the judgments, sold the premises to the plaintiff in error, and thereafter executed to him a deed in due form. The regularity of the sale is not contested.

The act of Aug. 22, 1868, was then in force. The acts of 1854 and 1859 had been repealed. *Wilson* v. *Sparks*, 72 N. C. 208. No point is made upon these acts by the counsel upon either side. We shall, therefore, pass them by without further remark.

The plaintiff in error brought this action in the Superior Court of Granville County, to recover possession of the premises so sold and conveyed to him. That court adjudged that the exemption created by the Constitution and the act of 1868 protected the property from liability under the judgments, and that the sale and conveyance by the sheriff were, therefore, void. Judgment was given accordingly. The Supreme Court of the State affirmed the judgment. The plaintiff in error thereupon brought the case here for review. The only Federal question presented by the record is, whether the exemption was valid as regards contracts made before the adoption of the Constitution of 1868.

The counsel for the plaintiff in error insists upon the negative of this proposition. The counsel upon the other side, frankly conceding several minor points, maintains the affirmative view. Our remarks will be confined to this subject.

The Constitution of the United States declares that "no State shall pass any . . . law impairing the obligation of contracts."

A contract is the agreement of minds, upon a sufficient con-

sideration, that something specified shall be done, or shall not be done.

The lexical definition of "impair" is "to make worse; to diminish in quantity, value, excellence, or strength; to lessen in power; to weaken; to enfeeble; to deteriorate." Webster's Dict.

"Obligation" is defined to be "the act of obliging or binding; that which obligates; the binding power of a vow, promise, oath, or contract," &c. Id.

"The word is derived from the Latin word *obligatio*, tying up; and that from the verb *obligo*, to bind or tie up; to engage by the ties of a promise or oath, or form of law; and *obligo*, is compounded of the verb *ligo*, to tie or bind fast and the preposition *ob*, which is prefixed to increase its meaning." *Blair* v. *Williams* and *Lapsley* v. *Brashears*, 4. Litt. (Ky.) 65.

The obligation of a contract includes every thing within its obligatory scope. Among these elements nothing is more important than the means of enforcement. This is the breath of its vital existence. Without it, the contract, as such, in the view of the law, ceases to be, and falls into the class of those "imperfect obligations," as they are termed, which depend for their fulfilment upon the will and conscience of those upon whom they rest. The ideas of right and remedy are inseparable. "Want of right and want of remedy are the same thing." 1 Bac. Abr., tit. Actions in General, letter B.

In *Von Hoffman* v. *City of Quincy* (4 Wall. 535), it was said: "A statute of frauds embracing pre-existing parol contracts not before required to be in writing would affect its validity. A statute declaring that the word 'ton' should, in prior as well as subsequent contracts, be held to mean half or double the weight before prescribed, would affect its construction. A statute providing that a previous contract of indebtment may be extinguished by a process of bankruptcy would involve its discharge; and a statute forbidding the sale of any of the debtor's property under a judgment upon such a contract would relate to the remedy."

It cannot be doubted, either upon principle or authority, that each of such laws would violate the obligation of the contract,

and the last not less than the first. These propositions seem to us too clear to require discussion. It is also the settled doctrine of this court, that the laws which subsist at the time and place of making a contract enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This rule embraces alike those which affect its validity, construction, discharge, and enforcement. *Von Hoffman* v. *City of Quincy, supra; McCracken* v. *Hayward,* 2 How. 508.

In *Green* v. *Biddle* (8 Wheat. 1), this court said, touching the point here under consideration: "It is no answer, that the acts of Kentucky now in question are regulations of the remedy, and not of the right to the lands. If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they overturned his rights and interests."

"One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not by the Constitution to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, — dispensing with any part of its force." *Planters' Bank* v. *Sharp et al.,* 6 How. 301.

It is to be understood that the encroachment thus denounced must be material. If it be not material, it will be regarded as of no account.

These rules are axioms in the jurisprudence of this court. We think they rest upon a solid foundation. Do they not cover this case; and are they not decisive of the question before us?

We will, however, further examine the subject.

It is the established law of North Carolina that stay laws are void, because they are in conflict with the national Constitution. *Jacobs* v. *Smallwood,* 63 N. C. 112; *Jones* v. *Crittenden,* 1 Law Repos. (N. C.) 385; *Barnes* v. *Barnes et al.,* 8 Jones (N. C.), L. 366. This ruling is clearly correct. Such laws change a term of the contract by postponing the time of payment. This impairs its obligation, by making it less valuable to the creditor. But it does this solely by operating on the remedy. The contract is not otherwise touched by the offending law. Let us suppose a case: A party recovers two judg-

ments, — one against A., the other against B., — each for the sum of $1,500, upon a promissory note. Each debtor has property worth the amount of the judgment, and no more. The legislature thereafter passes a law declaring that all past and future judgments shall be collected "in four equal annual instalments." At the same time, another law is passed, which exempts from execution the debtor's property to the amount of $1,500. The court holds the former law void and the latter valid. Is not such a result a legal solecism? Can the two judgments be reconciled? One law postpones the remedy, the other destroys it; except in the contingency that the debtor shall acquire more property, — a thing that may not occur, and that cannot occur if he die before the acquisition is made. Both laws involve the same principle and rest on the same basis. They must stand or fall together. The concession that the former is invalid cuts away the foundation from under the latter. If a State may stay the remedy for one fixed period, however short, it may for another, however long. And if it may exempt property to the amount here in question, it may do so to any amount. This, as regards the mode of impairment we are considering, would annul the inhibition of the Constitution, and set at naught the salutary restriction it was intended to impose.

The power to tax involves the power to destroy. *McCulloch* v. *Maryland*, 4 Wheat. 416. The power to modify at discretion the remedial part of a contract is the same thing.

But it is said that imprisonment for debt may be abolished in all cases, and that the time prescribed by a statute of limitations may be abridged.

Imprisonment for debt is a relic of ancient barbarism. Cooper's Justinian, 658; 12 Tables, Tab. 3. It has descended with the stream of time. It is a punishment rather than a remedy. It is right for fraud, but wrong for misfortune. It breaks the spirit of the honest debtor, detroys his credit, which is a form of capital, and dooms him, while it lasts, to helpless idleness. Where there is no fraud, it is the opposite of a remedy. Every right-minded man must rejoice when such a blot is removed from the statute-book.

But upon the power of a State, even in this class of cases,

see the strong. dissenting opinion of Mr. Justice Washington, in *Mason* v. *Haile*, 12 Wheat. 370.

Statutes of limitation are statutes of repose. They are necessary to the welfare of society. The lapse of time constantly carries with it the means of proof. The public as well as individuals are interested in the principle upon which they proceed. They do not impair the remedy, but only require its application within the time specified. If the period limited be unreasonably short, and designed to defeat the remedy upon pre-existing contracts, which was part of their obligation, we should pronounce the statute void. Otherwise, we should abdicate the performance of one of our most important duties. The obligation of a contract cannot be substantially impaired in any way by a State law. This restriction is beneficial to those whom it restrains, as well as to others. No community can have any higher public interest than in the faithful performance of contracts and the honest administration of justice. The inhibition of the Constitution is wholly prospective. The States may legislate as to contracts thereafter made, as they may see fit. It is only those in existence when the hostile law is passed that are protected from its effect.

In *Bronson* v. *Kinzie* (1 How. 311), the subject of exemptions was touched upon, but not discussed. There a mortgage had been executed in Illinois. Subsequently, the legislature passed a law giving the mortgagor a year to redeem after sale under a decree, and requiring the land to be appraised, and not to be sold for less than two-thirds of the appraised value. The law was held to be void in both particulars as to pre-existing contracts. What is said as to exemptions is entirely *obiter*; but, coming from so high a source, it is entitled to the most respectful consideration. The court, speaking through Mr. Chief Justice Taney, said: A State "may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of the mechanic, or articles of necessity in household furniture, shall, like wearing-apparel, not be liable to execution on judgments. Regulations of this description have always been considered in every civilized community as properly belonging to the remedy to be executed or not by every sovereignty, according to its own views of policy and humanity." He quotes with approba-

tion the passage which we have quoted from *Green* v. *Biddle*. To guard against possible misconstruction, he is careful to say further: " Whatever belongs merely to the remedy may be altered according to the will of the State, provided the alteration does not impair the obligation of the contract. But, if that effect is produced, it is immaterial whether it is done by acting on the remedy, or directly on the contract itself. In either case, it is prohibited by the Constitution."

The learned Chief Justice seems to have had in his mind the maxim " *de minimis*," &c. Upon no other ground can any exemption be justified. " Policy and humanity " are dangerous guides in the discussion of a legal proposition. He who follows them far is apt to bring back the means of error and delusion. The prohibition contains no qualification, and we have no judicial authority to interpolate any. Our duty is simply to execute it.

Where the facts are undisputed, it is always the duty of the court to pronounce the legal result. *Merchants' Bank* v. *State Bank*, 10 Wall. 604. Here there is no question of legislative discretion involved. With the constitutional prohibition, even as expounded by the late Chief Justice, before us on one hand, and on the other the State Constitution of 1868, and the laws passed to carry out its provisions, we cannot hesitate to hold that both the latter do seriously impair the obligation of the several contracts here in question. We say, as was said in *Gunn* v. *Barry* (15 Wall. 622), that no one can cast his eyes upon the new exemptions thus created without being at once struck with their excessive character, and hence their fatal magnitude. The claim for the retrospective efficacy of the Constitution or the laws cannot be supported. Their validity as to contracts subsequently made admits of no doubt. *Bronson* v. *Kinzie, supra.*

The history of the national Constitution throws a strong light upon this subject. Between the close of the war of the revolution and the adoption of that instrument, unprecedented pecuniary distress existed throughout the country.

" The discontents and uneasiness, arising in a great measure from the embarrassment in which a great number of individuals were involved, continued to become more extensive. At length,

two great parties were formed in every State, which were distinctly marked, and which pursued distinct objects with systematic arrangement." 5 Marshall's Life of Washington, 85. One party sought to maintain the inviolability of contracts, the other to impair or destroy them. "The emission of paper money, the delay of legal proceedings, and the suspension of the collection of taxes, were the fruits of the rule of the latter, wherever they were completely dominant." Id. 86.

"The system called justice was, in some of the States, iniquity reduced to elementary principles." . . . "In some of the States, creditors were treated as outlaws. . Bankrupts were armed with legal authority to be persecutors, and, by the shock of all confidence, society was shaken to its foundations." Fisher Ames's Works (ed. of 1809), 120.

"Evidences of acknowledged claims on the public would not command in the market more than one-fifth of their nominal value. The bonds of solvent men, payable at no very distant day, could not be negotiated but at a discount of thirty, forty, or fifty per cent per annum. Landed property would rarely command any price; and sales of the most common articles for ready money could only be made at enormous and ruinous depreciation.

"State legislatures, in too many instances, yielded to the necessities of their constituents, and passed laws by which creditors were compelled to wait for the payment of their just demands, on the tender of security, or to take property at a valuation, or paper money falsely purporting to be the representative of specie." 3 Ramsey's Hist. U. S. 77.

"The effects of these laws interfering between debtors and creditors were extensive. They destroyed public credit and confidence between man and man, injured the morals of the people, and in many instances insured and aggravated the ruin of the unfortunate debtors for whose temporary relief they were brought forward." 2 Ramsey's Hist. South Carolina, 429.

Besides the large issues of continental money, nearly all the States issued their own bills of credit. In many instances the amount was very large. Phillips's Historical Sketches of American Paper Currency, 2d Series, 29. The depreciation of both became enormous. Only one per cent of the "continental money" was assumed by the new government. Nothing more

was ever paid upon it. Id. 194. Act of Aug. 4, 1790, sect. 4 (1 Stat. 140). It is needless to trace the history of the emissions by the States.

The treaty of peace with Great Britain declared that "the creditors on either side shall meet with no lawful impediment to the recovery of the full amount in sterling money of all *bona fide* debts heretofore contracted." The British minister complained earnestly to the American Secretary of State of violations of this guaranty. Twenty-two instances of laws in conflict with it in different States were specifically named. 1 Amer. State Papers, pp. 195, 196, 199, and 237. In South Carolina, "laws were passed in which property of every kind was made a legal tender in payment of debts, although payable according to contract in gold and silver. Other laws installed the debt, so that of sums already due only a third, and afterwards only a fifth, was securable in law." 2 Ramsey's Hist. S. C. 429. Many other States passed laws of a similar character. The obligation of the contract was as often invaded after judgment as before. The attacks were quite as common and effective in one way as in the other. To meet these evils in their various phases, the national Constitution declared that "no State should emit bills of credit, make any thing but gold and silver coin a legal tender in payment of debts, or pass any law . . . impairing the obligation of contracts." All these provisions grew out of previous abuses. 2 Curtis's Hist. of the Const. 366. See also the Federalist, Nos. 7 and 44. In the number last mentioned, Mr. Madison said that such laws were not only forbidden by the Constitution, but were "contrary to the first principles of the social compact, and to every principle of sound legislation."

The treatment of the malady was severe, but the cure was complete.

"No sooner did the new government begin its auspicious course than order seemed to arise out of confusion. Commerce and industry awoke, and were cheerful at their labors, for credit and confidence awoke with them. Everywhere was the appearance of prosperity, and the only fear was that its progress was too rapid to consist with the purity and simplicity of ancient manners." Fisher Ames's Works (ed. of 1809), 122.

" Public credit was reanimated. The owners of property and holders of money freely parted with both, well knowing that no future law could impair the obligation of the contract." 2 Ramsey's History of South Carolina, 433.

Mr. Chief Justice Taney, in *Bronson* v. *Kinzie (supra)*, speaking of the protection of the remedy, said : " It is this protection which the clause of the Constitution now in question mainly intended to secure."

The point decided in *Dartmouth College* v. *Woodward* ( 1 Wheat. 518) had not, it is believed, when the Constitution was adopted, occurred to any one. There is no trace of it in the Federalist, nor in any other contemporaneous publication. It was first made and judicially decided under the Constitution in that case. Its novelty was admitted by Mr. Chief Justice Marshall, but it was met and conclusively answered in his opinion.

We think the views we have expressed carry out the intent of contracts and the intent of the Constitution. The obligation of the former is placed under the safeguard of the latter. No State can invade it; and Congress is incompetent to authorize such invasion. Its position is impregnable, and will be so while the organic law of the nation remains as it is. The trust touching the subject with which this court is charged is one of magnitude and delicacy. We must always be careful to see that there is neither nonfeasance nor misfeasance on our part.

The importance of the point involved in this controversy induces us to restate succinctly the conclusions at which we have arrived, and which will be the ground of our judgment.

The remedy subsisting in a State when and where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the State which so affects that remedy as substantially to impair and lessen the value of the contract is forbidden by the Constitution, and is, therefore, void.

The judgment of the Supreme Court of North Carolina will be reversed, and the cause will be remanded with directions to proceed in conformity to this opinion ; and it is

*So ordered*

MR. JUSTICE CLIFFORD and MR. JUSTICE HUNT concurred in the judgment. MR. JUSTICE HARLAN dissented.

MR. JUSTICE CLIFFORD. I concur in the judgment in this case, upon the ground that the State law, passed subsequent·to the time when the debt in question was contracted, so changed the nature and extent of the remedy for enforcing the payment of the same as it existed at the time·as materially to impair the rights and interests which the complaining party acquired by virtue of the contract merged in the judgment.

Where an appropriate remedy exists for the enforcement of the contract at the time it was made, the State legislature cannot deprive the party of such a remedy, nor can the legislature append to the right ·such restrictions or conditions as to render its exercise ineffectual or unavailing. State legislatures may change existing remedies, and· substitute others in their place ; and, if ᐧthe new remedy is not unreasonable, and will enable the party to enforce his rights without new and burdensome restrictions, the party is bound· to pursue the new remedy, the rule.being, that a State legislature may regulate at pleasure the modes of ·proceeding in·relation to ·past contracts as well as those made subsequent to the new regulation.

Examples where the· principle is universally accepted may be given to confirm the proposition. Statutes for the abolition of imprisonment for debt are of that character, and so are statutes requiring ·instruments to be· recorded, and statutes of limitation.

All admit that imprisonment for debt may be abolished in respect to past contracts as well as future ; and it is equally well settled that the time within·which a claim or entry shall be barred may be shortened, without just complaint from any quarter. Statutes of the kind have often been passed ; and it has never been held that such an alteration in such a statute impaired the obligation of a .prior contract, unless the period allowed in the new law was so short and unreasonable as to amount to a substantial· denial of the remedy to enforce the right. Angell, Lim. (6th ed.), sect. 22; *Jackson* v. *Lamphire,* 3 Pet. 280..

Beyond all doubt, a State legislature may regulate all such

proceedings in its courts at pleasure, subject only to the condition that the new regulation shall not in any material respect impair the just rights of any party to a pre-existing contract. Authorities to that effect are numerous and decisive; and it is equally clear that a State legislature may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of the mechanic, or certain articles of universal necessity in household furniture, shall, like wearing-apparel, not be liable to attachment and execution for simple-contract debts. Regulations of the description mentioned have always been considered in every civilized community as properly belonging to the remedy to be exercised or not by every sovereignty, according to its own views of policy and humanity.

Creditors as well as debtors know that the power to adopt such regulations reside in every State, to enable it to secure its citizens from unjust, merciless, and oppressive litigation, and protect those without other means in their pursuits of labor, which are necessary to the well-being and the very existence of every community.

Examples of the kind were well known and universally approved both before and since the Constitution was adopted, and they are now to be found in the statutes of every State and Territory within the boundaries of the United States; and it would be monstrous to hold that every time some small addition was made to such exemptions that the statute making it impairs the obligation of every existing contract within the jurisdiction of the State passing the law.

Mere remedy, it is agreed, may be altered, at the will of the State legislature, if the alteration is not of a character to impair the obligation of the contract; and it is properly conceded that the alteration, though it be of the remedy, if it materially impairs the right of the party to enforce the contract, is equally within the constitutional inhibition. Difficulty would doubtless attend the effort to draw a line that would be applicable in all cases between legitimate alteration of the remedy, and provisions which, in the form of remedy, impair the right; nor is it necessary to make the attempt in this case, as the courts of all nations agree, and every civilized community will concede, that laws exempting necessary wearing-

apparel, the implements of agriculture owned by the tiller of the soil, the tools of the mechanic, and certain articles or utensils of a household character, universally recognized as articles or utensils of necessity, are as much within the competency of a State legislature as laws regulating the limitation of actions, or laws abolishing imprisonment for debt. *Bronson* v. *Kinzie*, 1 How. 311.

Expressions are contained in the opinion of the court which may be construed as forbidding all such humane legislation, and it is to exclude the conclusion that any such views have my concurrence that I have found it necessary to state the reasons which induced me to reverse the judgment of the State court.

MR. JUSTICE HUNT.    I concur in the judgment in this case, for the reasons following : —

By the Constitution of North Carolina of 1868, the personal property of any resident of the State, to the value of $500, is exempt from sale under execution; also, a homestead, the dwelling and buildings thereon, not exceeding in value $1,000.

The debts in question were incurred before the exemptions took effect.   The court now holds that the exemptions are invalid.   In this I concur, not for the reason that any and every exemption made after entering into a contract is invalid, but that the amount here exempted is so large, as seriously to impair the creditor's remedy for the collection of his debt.

I think that the law was correctly announced by Mr. Chief Justice Taney in *Bronson* v. *Kinzie* (1 How. 311), when he said : A State " may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of a mechanic, or articles of necessity in household furniture, shall, like wearing-apparel, be not liable to execution on judgments."

The principle was laid down with the like accuracy by Judge Denio, in *Morse* v. *Goold* (11 N. Y. 281), where he says: " There is no universal principle of law that every part of the property of a debtor is liable to be seized for the payment of a judgment against him. . . . The question is, whether the law which prevailed when the contract was made has been so far changed that there does not remain a substantial and reasonable mode

of enforcing it in the ordinary and regular course of justice. Taking the mass of contracts and the situation and circumstances of debtors as they are ordinarily found to exist, no one could probably say that exempting the team and household furniture of a householder to the amount of $150 from levy or execution would directly affect the efficiency of remedies for the collection of debts." Mr. Justice Woodbury lays down the same rule in *Planters' Bank* v. *Sharp et al.*, 6 How. 301.

In my judgment, the exemption provided for by the North Carolina Constitution is so large, that, in regard to the mass of contracts and the situation and circumstances of debtors as they are ordinarily found to exist, it would seriously affect the efficiency of remedies for the collection of debts, and that it must, therefore, be held to be void.